IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWIN T. JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15-cv-02263 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| IGOR B. OYSTACHER, an individual, and | ) |
| 3RED GROUP OF ILLINOIS LLC, | ) |
| an Illinois limited liability company, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Edwin Johnson claims that his former business partner, Igor Oystacher, engaged in a market manipulation scheme through their company, 3Red Group of Illinois LLC ("3Red"). Johnson alleges that when he confronted Oystacher about the scheme, Oystacher unlawfully terminated him from 3Red and coerced him into executing a settlement agreement, the terms of which effectively prevent Johnson from speaking to regulatory authorities regarding Oystacher's illegal trading. Johnson's five-count amended complaint includes claims under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and the anti-retaliation provisions (also referred to as the whistleblower protections) of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, as well as a number of state law claims. Before the Court is Defendants' motion to dismiss Johnson's RICO and Commodity Exchange Act claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and his state law claims pursuant to 28 U.S.C. § 1367(c)(3).[1] (Dkt. No. 28.) Defendants also argue that Johnson's RICO claim

---

[1] Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction.

should be dismissed for failure to plead fraud with particularity as required by Federal Rule of Procedure 9(b). For the reasons stated below, Defendants' motion is granted.

## BACKGROUND

The following facts are taken from Johnson's amended complaint.[2] In November 2010, Johnson and Oystacher, a high-volume futures trader, agreed to go into business together. (Am. Compl. ¶¶ 2, 4, 6, Dkt. No. 22.). They formed 3Red Group LLC,[3] a holding company, in January 2011, and, approximately five months later, formed 3Red Trading LLC, a proprietary trading company managed by 3Red. (*Id.*) During the relevant time period, Johnson and Oystacher were the only managing members of 3Red. (*Id.* ¶ 6.) Johnson served as the company's Chief Risk Officer and the manager of day-to-day operations, while Oystacher was responsible for trading (*Id.* ¶¶ 8, 18, 76.) At the time of his termination in June 2013, Johnson owned ten percent of 3Red, with the other ninety percent held by Oystacher. (*Id.* ¶¶ 34, 36.)

While trading through 3Red, Oystacher was engaged in a market manipulation scheme that involved spoofing—an unlawful trading practice in which the trader submits one or more bids or offers with the intent to cancel such bids or offers prior to execution, allowing the trader to profit by then trading against the market. (*Id.* ¶¶ 8–9.)[4] On March 1, 2012, the United States Commodity Futures Trading Commission ("CFTC") issued a subpoena to Oystacher in connection with the *Matter of Igor Oystacher and 3Red Trading LLC*, an inquiry into Oystacher's

---

[2] For purposes of the present motion, the Court accepts as true all well-pleaded factual allegations set forth in the amended complaint and views them in the light most favorable to Johnson. *See, e.g., Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)).

[3] 3Red was originally incorporated in Illinois as 3Red Group LLC but later changed its name to 3Red Group of Illinois LLC. (Am. Compl. ¶ 35.)

[4] Johnson states that Oystacher was engaged in illegal trading from "at least February 2013 until at least March 2013." (Am. Compl. ¶ 9.) While the amended complaint focuses on Oystacher's trading activity in February and March of 2013, Johnson also alleges generally that Oystacher "spoofed" the market on numerous occasions between February 2011 and March 2013. (*Id.* ¶ 38.)

trading activity. (*Id.* ¶ 7). In December 2012, Johnson gave testimony to the CFTC in connection with that inquiry, stating that he did not believe Oystacher was engaged in improper trading. (*Id.* ¶¶ 19–20, 105.) At the time, Johnson did not believe Oystacher's trading was illegal because Oystacher had represented that, because he did not intend to cancel his bids and offers when he made them, he was not spoofing. (*Id.* ¶ 104.) Later, various futures exchanges, including the CBOE Futures Exchange ("CFE"),[5] Chicago Mercantile Exchange ("CME"), EUREX, ICE Futures Europe, and NYSE/Euronext, initiated reviews of Oystacher's trading activity. (*Id.* ¶¶ 13, 15–16, 109.)[6] As a result, Johnson became increasingly concerned that Oystacher's trading was improper. (*Id.* ¶¶ 106–07.)

In May 2013, the CFTC issued guidance clarifying that spoofing is a disruptive and unlawful trading practice regardless of the trader's intent. (*Id.* ¶ 114.) In light of this guidance, and as he learned more about Oystacher's trading in connection with various regulatory inquiries, it became clear to Johnson that Oystacher was engaged in spoofing. (*Id.* ¶¶ 106–07, 116.) In June 2013, Johnson confronted Oystacher, stating that his trading practices were putting 3Red's business at risk and demanding that he either stop his improper trading or cease trading altogether. (*Id.* ¶ 8, 117.) In retaliation for that confrontation and because he was concerned that Johnson would blow the whistle on him, Oystacher developed a plan to oust Johnson from 3Red and to prevent him from speaking to regulatory authorities. (*Id.* ¶¶ 118, 134.)

In a meeting on June 17, 2013, Defendants accused Johnson of misrepresenting his capital contribution to 3Red, using money from 3Red for personal use without authorization, and creating a phony 3Red operating agreement. (*Id.* ¶ 120.) During the meeting, Johnson's 3Red email

---

[5] The National Futures Association ("NFA") conducted the regulatory investigation into Oystacher's trading activity on behalf of the CFE. (*Id.* ¶ 11.)

[6] According to Johnson, Oystacher's trading activity was under review by multiple exchanges and regulatory bodies "from in or about February 2011 until at least June 2013." (*Id.* ¶ 15.)

account was disabled, and, after the meeting, Johnson was denied access to the company's offices. (*Id.* ¶ 123.) Oystacher then used threats to coerce Johnson into signing a settlement agreement, the terms of which were meant to prevent him from disclosing to regulators information about Oystacher's illegal trading. (*Id.* ¶¶ 17–18.)[7] Specifically, Oystacher threatened (1) to report "trumped up charges" against Johnson to criminal authorities; (2) that Johnson would go to jail if he refused to sign the settlement agreement or if he disclosed Oystacher's illegal trading to regulatory authorities; and (3) that Johnson would be charged with perjury if he gave testimony to regulatory authorities that was different from the testimony he gave to the CFTC in December 2012. (*Id.* ¶¶ 135, 145.) Johnson, under duress, ultimately signed the agreement, thereby relinquishing his ten percent ownership interest in 3Red. (*Id.* ¶ 22, 146.)[8]

In December 2014, Defendants sued Johnson in the Circuit Court of Cook County, Illinois, asserting claims based on Johnson's alleged breaches of various provisions of the parties' settlement agreement. (*See* Defs.' Mem. in Support of Mot. to Dismiss at 3, Ex. A, Ex. 1 to Ex. A, Dkt. Nos. 29, 29-1, 29-2.)[9] In their complaint, Defendants allege that Johnson has violated the terms of the agreement by (1) disclosing false or confidential information; (2) failing to timely return 3Red documents; and (3) failing to comply with the agreement's notice requirements with

---

[7] Specifically, the settlement agreement provides that all monthly payments owed to Johnson under the agreement are to cease in the event that either Oystacher or 3Red is fined by regulators or governmental agencies in a cumulative amount of one million dollars or more or is barred from trading for a cumulative period of five months or more (for conduct related to trading occurring prior to Johnson's termination). (Am. Compl. ¶ 138 & Ex. K at 3.) The settlement agreement also requires Johnson to notify 3Red in the event he is contacted by any regulatory body or governmental agency. (*Id.* ¶ 140 & Ex. K at 8.)

[8] Oystacher refused to pay Johnson for the value of his ownership interest in the company. (Am. Compl. ¶ 23.) He also refused to make any severance payments to Johnson and did not allow for 3Red to make any capital contributions to Johnson, as was required in the company's operating agreement. (*Id.*)

[9] In deciding Defendants' motion to dismiss, the Court may take judicial notice of public court documents filed in the parties' state court case. *See, e.g.*, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). A copy of the complaint filed in the Circuit Court of Cook County is included as an exhibit to Defendants' memorandum in support of their motion to dismiss. (*See* Ex. 1 to Ex. A, Dkt. No. 29-2.)

respect to his receipt of any government or regulatory requests. (*Id.*) In response, Johnson filed a motion to dismiss, contending that the settlement agreement is unenforceable because it was obtained through coercion and duress and because it violates law and public policy. (*Id.* & Ex. 2 to Ex. A, Dkt. No. 29-3.) According to Defendants, after the state court entered a number of substantive rulings adverse to Johnson, he filed this lawsuit in the hopes of finding a friendlier forum in federal court.

In his amended complaint, Johnson claims that Oystacher (1) obtained his ten percent interest in 3Red through a pattern of racketeering activity in violation of RICO's civil provisions (specifically, in violation of 18 U.S.C. § 1962(b)); and (2) retaliated against him and attempted to prevent him from assisting the CFTC in its ongoing investigation into Oystacher's trading, in violation of the anti-retaliation provisions of the Commodity Exchange Act (specifically, in violation of 7 U.S.C. § 26(h)(1)(A)(ii)). With respect to his state law claims, Johnson seeks (1) a declaratory judgment that the settlement agreement is unenforceable; (2) a declaratory judgment that the 3Red operating agreement was valid (or, in the alternative, a determination of the fair value of his ownership interest in 3Red under the Illinois Limited Liability Company Act); and (3) an order of prejudgment attachment of Defendants' assets.

In their motion to dismiss the amended complaint, Defendants argue that Johnson has failed to plead the required elements of a civil RICO claim, has failed to plead the RICO predicate acts with particularity, and has failed to state a claim under the Commodity Exchange Act's anti-retaliation provisions. Assuming those two claims—the only claims for which original federal jurisdiction exists—are dismissed, Defendants argue that the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims, particularly in light of the fact that the same claims are the subject of earlier filed, currently pending litigation in state court.

**DISCUSSION**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, the short and plain statement must meet two threshold requirements. First, the complaint's factual allegations must be sufficient to give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Second, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

In addition, Federal Rule of Civil Procedure 9(b) requires a plaintiff alleging fraud to state the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011)). "[A]llegations of fraud in a civil RICO complaint are subject to the heightened pleading standard of [Rule 9(b).]" *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) (internal citation omitted); *see also Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir. 1991) ("RICO plaintiffs, like all other parties pleading fraud in federal court, must state the time, place

and content of the alleged communications perpetrating the fraud." (internal citations and quotation marks omitted)).

### I. Johnson's RICO Claim

RICO claim is somewhat of a moving target. In fact, the allegations made by Johnson as well as the arguments made by Defendants are all over the board in terms of the proper elements to be satisfied and standards to be applied under RICO's civil provisions. Both parties seem to have thrown everything at the wall to see what sticks, leaving the Court to wade through voluminous briefs, significant portions of which are not on point. This is largely because Johnson seeks to do exactly what the Seventh Circuit has advised against: he is "trying to fit a square peg in a round hold by squeezing [a] garden-variety business dispute[] into [a] civil RICO action[]." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992). Despite Johnson's efforts to make this a complicated case, it is really quite simple. At its core, the amended complaint alleges that Oystacher, apprehensive that Johnson would report his spoofing, unlawfully ousted him from 3Red, took over his ownership interest in the company, and coerced him into signing a settlement agreement that prevents him from cooperating with regulatory authorities. In other words, this is a dispute between two former business partners for which there are common law and state law remedies. *See id.* ("RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.")

Both parties seem to confuse and conflate two different provisions of the RICO statute—Section 1962(b) (which makes it unlawful for a person, through a pattern of racketeering activity, to acquire or maintain an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce) and Section 1962(c) (which makes it unlawful for a person employed by or associated with an enterprise engaged in, or the activities of

7

which affect, interstate or foreign commerce, to conduct such enterprise's affairs through a pattern of racketeering activity). *See* 18 U.S.C. § 1962(b)–(c). RICO confers the right to seek civil remedies on any person who is injured in his business or property by reason of a violation of either of those two sub-sections. *See* 18 U.S.C. § 1964(c). Johnson states in his amended complaint and reiterates in his response brief that his RICO claim is brought under Section 1962(b)—not Section 1962(c)—and the Court will thus take Section 1962(b) as the relevant provision for purposes of this motion (Am. Compl. ¶¶ 147–52; Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 15, Dkt. No. 31.)

The following elements are common to claims under both RICO sub-sections: (a) a person who (b) has engaged in a pattern of racketeering activity (c) involving an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and (d) injury to the plaintiff.[10] *See, e.g.*, *Pelfresne v. Vill. of Rosemont*, 174 F.R.D. 72, 77 (N.D. Ill. 1997); *P&P Mktg., Inc. v. Ditton*, 746 F. Supp. 1354, 1357 (N.D. Ill. 1990). For purposes of this motion, it is assumed that elements (a) and (c) are satisfied, as Oystacher fits the statute's definition of "person,"[11] and the Court accepts as true Johnson's allegation that "3Red is an enterprise engaged in and whose activities affect interstate commerce." (Am. Compl. ¶ 148.)[12] As to element (b), "racketeering activity" is

---

[10] Injury to business or property has been interpreted as a standing requirement, rather than an element of the cause of action. *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 855 (N.D. Ill. 2008) (citing *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir.)).

[11] "Person" is defined to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

[12] Johnson's amended complaint identifies both 3Red and Oystacher himself as the relevant RICO enterprise. (*See* Am. Compl. ¶¶ 39–43.) The Court accepts, for purposes of this motion, Johnson's position that the amended complaint's reference to Oystacher as a RICO enterprise does not detract from its subsequent identification of 3Red as the relevant enterprise. (*See* Pl. Resp. to Defs. Mot. to Dismiss ¶¶ 58–59.)

defined to encompass any of the state and federal offenses—known as predicate acts—that are listed in Section 1961(1) of the RICO statute. *See* 18 U.S.C. § 1961(1). A pattern of racketeering activity requires two or more predicate acts within a ten-year period. 18 U.S.C. § 1961(5).

Johnson here has failed to make clear the predicate acts upon which he rests his RICO claim. He alleges that Oystacher's spoofing, a violation of the wire fraud statute (18 U.S.C. § 1343), and his attempt to prevent Johnson from complying with regulatory inquiries, a violation of the witness tampering statute (18 U.S.C. § 1512(b)(1)), are predicate acts constituting a pattern of racketeering activity. But Johnson then confuses the issue by stating that Oystacher usurped his ten percent interest in 3Red through his pattern of racketeering activity *and* as a result of his violation of a separate extortion statute, 18 U.S.C. § 1951, which makes it unlawful to interfere with commerce with the use of threats. In a section of the amended complaint titled "Oystacher's Indictable Acts of Racketeering Activity," Johnson references violations of the wire fraud statute, the witness tampering statute, and the extortion statute. In the next section of the complaint, Johnson sets forth nine separate predicate acts of racketeering—one through eight are alleged violations of the wire fraud statute and nine is a violation of the witness tampering statute. However, the following section then describes how Oystacher acquired Johnson's interest in 3Red through a violation of the extortion statute. Finally, Johnson states that "Oystacher's violation of 18 U.S.C. § 1951, together with Oystacher's violations of 18 U.S.C. § 1343 and 18 U.S.C. § 1512(b)(1) constitutes a pattern of racketeering." (*Id.* ¶ 150.)

In his response brief, Johnson asserts:

> [Defendants] repeatedly misstate the predicate acts pled by Plaintiff . . . Defendants state that Plaintiff has pled multiple acts of wire fraud as well as a singular act of extortion as predicate acts . . . This is untrue . . . Plaintiff has indeed pled numerous

---

Notably, the criteria for establishing some nexus between the enterprise and interstate commerce are minimal. *H.G. Gallimore, Inc. v. Abdula*, 652 F. Supp. 437, 441 (N.D. Ill. 1987) (internal citations omitted).

> predicate acts of wire fraud, but the ninth predicate act pled by Plaintiff was not "extortion," as Defendants aver. In reality, Plaintiff pled a predicate act of witness tampering pursuant to 18 U.S.C. § 1512(b)(1).

(Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 24 & n.3.) But Johnson then describes the injuries he has suffered from the predicate acts, which include "an inability to adequately represent his interests during and throughout the settlement negotiations as a result of numerous threats made by Oystacher's counsel." (*Id.* ¶ 37.) In short, having failed to clearly allege the predicate acts, Johnson has made it very difficult to assess his RICO claim. For purposes of this motion, however, the Court will take Johnson's statements in his response brief at face value and consider wire fraud and witness tampering—not extortion—as the alleged predicate acts.

The question then is whether Oystacher's alleged acts of wire fraud and witness tampering constitute a pattern of racketeering activity for RICO purposes. To prove a pattern of racketeering activity, a plaintiff "must satisfy the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding*, 976 F.2d at 1022. The relationship prong "requires that the predicate acts be committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 779 (7th Cir. 1994) (internal citation and quotation marks omitted); *see also DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) ("A relationship is established if the criminal acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (internal citation and quotation marks omitted)). The Supreme Court has held that continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of

10

repetition." *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). In other words, "a RICO plaintiff can prevail by either (1) demonstrating a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future." *Midwest Grinding*, 976 F.2d at 1023 (finding that the defendants' alleged scheme of diverting customers and employees away from the plaintiff did not satisfy continuity under either an open-ended or closed-ended analysis).

Johnson claims that Oystacher's predicate acts of wire fraud and witness tampering are related "by having similar purposes, results, participants, victims, and methods of commission" and that they fit the open-ended continuity concept. (Am. Compl. ¶¶ 44–45.) In his response brief, Johnson further explains that the witness tampering predicate act is related to the wire fraud predicate acts "because its specific purpose was both to acquire complete control of 3Red, and also to silence Plaintiff such that Oystacher's market manipulation could continue unabated." (Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 24.)[13] As to open-ended continuity, Johnson asserts that "[t]he type of illegal market manipulation that comprises a significant portion of the predicate acts is easily repeatable, and poses a grave threat to participants . . . in commodity and futures markets." (*Id.* ¶ 28.) The Court is not fully convinced that Oystacher's alleged witness tampering is adequately related to his purported market manipulation scheme to constitute a singular pattern of racketeering activity. Even if it were, it is not clear that there is a continued threat of this particular pattern of criminal activity. But it is unnecessary—and improper at the motion to dismiss stage—for the Court to make this fact-intensive determination because Johnson has failed

---

[13] As discussed further below, it is unclear how Oystacher's alleged witness tampering was meant to, or did in fact, allow him to acquire Johnson's interest in 3Red.

11

to show a connection between Oystacher's alleged pattern of racketeering activity and his acquisition of complete control of 3Red.

A proper RICO claim under Section 1962(b) must contain two allegations: (1) that the defendant acquired or maintained an interest in or control of an enterprise through a pattern of racketeering activity; and (2) that the plaintiff suffered an injury through the defendant's acquisition or maintenance of an interest in or control of the pertinent enterprise that is separate from the injury or injuries resulting from the predicate acts. *Xinos v. Kappos*, 270 F. Supp. 2d. 1027, 1032–33 (N.D. Ill. 2003).[14] As alleged, it is clear that Johnson's injury stems not from the purported predicate acts of wire fraud and witness tampering but from Oystacher's acquisition of Johnson's ten percent interest in 3Red, and that this injury is separate from any injury to Johnson or others caused by the predicate acts.[15] But Johnson fails to sufficiently plead that Oystacher's acquisition of his interest in 3Red, or that Oystacher's maintenance of control over the company, was accomplished through the alleged pattern of racketeering activity—that is, through spoofing and witness tampering.

To bring a claim under Section 1962(b), a plaintiff must show a specific nexus between the alleged pattern of racketeering activity and the defendant's acquisition or maintenance of an interest in or control of the RICO enterprise. *See Kotsilieris v. Chalmers*, 1989 WL 10839, at *2

---

[14] For a Section 1962(c) claim, on the other hand, the plaintiff's injury must flow from the commission of the predicate acts. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985). This is likely why Johnson did not bring his claim under Section 1962(c)—because he was not directly injured by the alleged predicate acts of wire fraud and witness tampering but by his termination from 3Red and the loss of his ten percent interest in the company.

[15] Defendants argue that Johnson has failed to identify a separate and distinct injury because "the only alleged injury identified in the Amended Complaint is the same injury alleged to have resulted from the predicate act of extortion—specifically, Johnson's termination and sale of his 3Red interests at less than full value." (Defs. Reply in Support of Mot. to Dismiss at 7, Dkt. No. 33.) But, because Johnson is not alleging extortion as a predicate act, this argument is off base. In fact, elsewhere in their reply brief, Defendants argue that Johnson's abdication of extortion as a predicate act is fatal to his claim. (*Id.* at 1.) Defendants may not pick and choose whether and when to accept Johnson's assertion that extortion is not a predicate act on the basis of whether it bolsters their arguments.

(N.D. Ill. Feb. 7, 1989) (citing *Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*, 656 F. Supp. 49, 85 (S.D. Ohio 1986)). Johnson contends that such a nexus exists here because "Oystacher's numerous predicate acts of wire fraud serve as the foundation for [Johnson's] inquiries into Oystacher's illegal trading practices, which prompted Oystacher to unlawfully terminate [Johnson] and seize complete control of 3Red, and thereby allow his illegal trading activities to continue unimpeded." (Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 20.) But this chain is simply too long; Oystacher's seizure of complete control of 3Red is too far removed from the predicate acts. Oystacher obtained Johnson's interest in 3Red by terminating him from the company—not by spoofing the market or preventing him from cooperating with regulators. Johnson might have argued that Oystacher acquired complete control of 3Red through coercing his execution of the settlement agreement but, having dropped extortion as a predicate act, that argument would do nothing to bolster his claim.[16] Because Oystacher did not terminate Johnson and acquire Johnson's interest in 3Red **through** spoofing and witness tampering, Johnson has failed to state a claim under Section 1962(b).

Having rejected Johnson's RICO claim for the reasons discussed above, the Court need not address Defendants' independent arguments for dismissal: failure to establish that 3Red is a RICO enterprise, failure to plead the alleged predicate acts with particularity, improper extraterritorial application of RICO and the wire fraud statute, and express waiver of this claim in the parties' settlement agreement. The Court agrees that this is in essence a business dispute regarding the enforceability of the 3Red operating agreement and the parties' settlement agreement and the lawfulness of Johnson's termination. Johnson has been harmed by his

---

[16] If extortion were alleged as a predicate act, it is not clear how Johnson would satisfy the pattern requirement. And he would have difficulty showing that he suffered an injury from Oystacher's takeover of 3Red that is separate and distinct from the injury resulting from the alleged extortion.

termination from 3Red, regardless of any racketeering activity, and he is therefore not a proper RICO claimant.

## II.  Johnson's Commodity Exchange Act Claim

Johnson claims that Oystacher's "plan to silence him," implemented in response to the June 2013 confrontation regarding Oystacher's market manipulation scheme, constitutes a violation of the anti-retaliation provisions of the Commodity Exchange Act. Specifically, Johnson alleges that, in retaliation for that confrontation, Oystacher unlawfully terminated him from 3Red and attempted to prevent him from assisting the CFTC in its investigation into Oystacher's trading.

The Commodity Exchange Act protects whistleblowers against retaliation by prohibiting employers from "discharg[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], directly or indirectly, or in any other manner discriminat[ing] against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower—(i) in providing information to the [CFTC]…or (ii) in assisting in any investigation or judicial or administrative action of the [CFTC] based upon or related to such information." 7 U.S.C. § 26(h)(1)(A). The term "whistleblower" is defined to include individuals who provide information to the CFTC relating to a potential violation of the Commodity Exchange Act. *See id.* § 26(a)(7); 17 CFR § 165.2(p)(1).

Johnson acknowledges that, by its terms, the Commodity Exchange Act does not provide any protections for *potential* whistleblowers. After conceding that point, Johnson cites a regulation related to the whistleblower protections under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, which provides that no person may take any action to impede an individual from communicating with the United States Securities and Exchange Commission ("SEC") about

14

a possible securities law violation. *See* 17 C.F.R. § 240.21F-17(a). Johnson then states that the settlement agreement he was forced to execute "plainly is intended to muzzle [him] from speaking to regulators and/or governmental agencies." (Am. Compl. ¶ 161.) Johnson does not allege that such "muzzling" is a violation of the Commodity Exchange Act, nor does he close the gap between the Commodity Exchange Act and the unrelated, inapplicable Securities Exchange Act regulation cited.

Rather, Johnson argues that the whistleblower protections afforded by the SEC should be imputed to the Commodity Exchange Act. He cites *Berman v. Neo@Ogilvy LLC*, 72 F. Supp. 3d 404 (S.D.N.Y. 2014), for the proposition that the SEC has interpreted the term "whistleblower" as used in the Securities Exchange Act's anti-retaliation provisions to include individuals who report potential securities violations internally to their supervisors. Johnson asserts that the difference in the statutory schemes promulgated by the SEC and CFTC goes against clear congressional intent as well as the intent of the agencies themselves. According to Johnson, he should be deemed a whistleblower under the Commodity Exchange Act because it is inconsistent with the intent of whistleblower protections to treat those who were able to blow the whistle differently than those who were prevented from doing so. Johnson contends that the Court, for reasons of public policy, should give weight to what he characterizes as "repeated pushes to harmonize regulation between the SEC and CFTC" and should grant him

> the opportunity to proceed to a trial on the merits to determine whether or not the [Commodity Exchange Act] should be read in such a manner so as to provide a narrow exception to the rule requiring actual disclosure to the CFTC when an individual who would have otherwise disclosed information to the CFTC is prevented from doing so by the extortionate conduct of a third party.

(Pl.'s Resp. to Defs.' Mot. to Dismiss ¶¶ 89–90.)

But issues of statutory interpretation are questions of law to be decided by the court, not by the trier of fact, so Johnson's assertion that he should be afforded the opportunity to proceed to a trial on the question of whether his desired exception should be read into the Commodity Exchange Act is entirely off base. By its plain language, the statute creates a private cause of action only for individuals who are retaliated against for providing information to the CFTC or for assisting in a CFTC action based upon or related to such information. Because Johnson undisputedly does not fall into either of those two categories, he does not qualify as a whistleblower under the Commodity Exchange Act and therefore fails to state a viable claim for relief under the statute's anti-retaliation provisions.

As Defendants note, Johnson has not cited a single instance in which an individual has been afforded protection under the Commodity Exchange Act's anti-retaliation provisions in circumstances similar to those here (*i.e.*, where an employer retaliated against an employee for reporting or raising a potential violation internally and attempted to prevent the employee from reporting to the CFTC). Moreover, Johnson's argument that the language in Section 26(h)(1)(A) of the Commodity Exchange Act should be harmonized with different language in the comparable section of the Securities Exchange Act is unconvincing. Johnson does not contend that the meaning of identical language in two different statutes should be harmonized; rather, his argument centers on the interpretation of a clause in the Securities Exchange Act that does not even appear in the Commodity Exchange Act.[17] Because the text of the Commodity Exchange

---

[17] While Section 26(h)(1)(A) of the Commodity Exchange Act includes only the two previously-cited clauses, the comparable section of the Securities Exchange Act includes a third clause that prevents retaliation against a whistleblower for "making disclosures that are required or protected" under the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.*, the Securities Exchange Act, or any other law, rule, or regulation subject to the SEC's jurisdiction. *See* 15 U.S.C. § 78u-6(h)(1)(A)(iii).

There was previously uncertainty as to whether this additional clause protects individuals who report potential violations internally rather than to the SEC. As stated in Johnson's notice of supplemental

16

Act is plain and unambiguous, the Court's inquiry begins and ends with that text. *See BedRoc Ltd. v.United States*, 541 U.S. 176, 183 (2004). The Court rejects Johnson's argument that the text and interpretation of a different statute, applicable to a different governmental agency with a different enforcement scheme, should have any bearing on the analysis here.

On a final note, Johnson submitted two notices of supplemental authority (Dkt. Nos. 50, 57), related to the CFTC's revisions to the regulations implementing the Commodity Exchange Act's whistleblower protections. *See* 82 Fed. Reg. 24487. Among the revisions was the addition of 17 C.F.R. § 165.20(c), which extends the Commodity Exchange Act's anti-retaliation protections to whistleblowers who report internally prior to providing information to the CFTC. But "administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). And 17 C.F.R. § 165.20(c) was enacted well after Johnson was terminated. Johnson points to no language in the regulation indicating that it applies retroactively. In any case, in enacting the new regulation, the CFTC made clear that "the anti-retaliation protections in the [Commodity Exchange Act] do not extend to all whistleblowers who report internally." 82 Fed. Reg. at 24494. Rather, the whistleblower must still "be able to show that retaliation occurred because of any lawful act done by the whistleblower in providing information to the [CFTC] . . . or assisting in any investigation or judicial administrative action of the [CFTC] based upon or related to such information." *Id.* As discussed above, Johnson does not allege that he provided information to the CFTC or otherwise assisted it in an investigation or administrative action. Thus, regardless of the regulation's retroactive effect, his claim still fails.

---

authority—which has no impact on the Commodity Exchange Act framework—an interpretive rule issued by the SEC on August 4, 2015 clarifies that, for purposes of the Securities Exchange Act's anti-retaliation provisions, an individual who reports internally is no less protected than an individual who reports to the SEC.

### III. Johnson's State Law Claims

Having dismissed Johnson's two federal claims, the Court, pursuant to 28 U.S.C. § 1367(c)(3) and following well-established Seventh Circuit precedent, declines to exercise supplemental jurisdiction over the state law claims set forth in Counts III through VI of the amended complaint. *See, e.g.*, *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). This is not one of the limited situations in which jurisdiction over supplemental state law claims should be retained even though the federal claims have dropped out. *See, e.g., Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 906–07 (7th Cir. 2007) (internal citations omitted). And given the early stage of this lawsuit and the fact that at least one of Johnson's state law claims—relating to the enforceability of the parties' settlement agreement—is at issue in earlier filed, currently ongoing litigation in state court,[18] judicial economy weighs in favor of dismissal. Finally, Johnson cites no support for his conclusory contention that his state law claims directly affect matters of federal public policy and should therefore remain in federal court. There is thus no reason to overcome the presumption in favor of relinquishing supplemental jurisdiction when the federal claims over which the Court has original jurisdiction have been dismissed.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (Dkt. No. 28) is granted. The amended complaint is dismissed without prejudice, and Johnson is granted leave to file a second amended complaint by November 12, 2018. If Johnson chooses to amend his RICO claim, he should make clear which provision of the statute he means to invoke and what predicate acts form the basis of his claim. Having failed to do so here, Defendants do not have fair notice of his

---

[18] As Defendants point out, the Court may take judicial notice of proceedings in other courts—both federal and state—where the proceedings are directly related to the matters at issue, even if those proceedings are not made a part of the record. *See United States v. Hope*, 906 F.2d 254, 260 n.1 (7th Cir. 1990).

claim and the grounds upon which it rests. With respect to his Commodity Exchange Act claim, Johnson may not proceed under the theory that Oystacher's alleged attempt to prevent him from blowing the whistle constitutes a violation of the Act. If he desires to pursue some other theory, he may re-plead. Johnson's state law claims, over which the Court declines to exercise supplemental jurisdiction, are also dismissed without prejudice.

ENTERED:

Dated: October 22, 2018

_____
Andrea R. Wood
United States District Judge