# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDWIN JOHNSON, | ) |
| Plaintiff, | ) |
| v. | ) No. 15-cv-02263 |
| | ) Judge Andrea R. Wood |
| IGOR B. OYSTACHER, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Edwin Johnson is a former officer and managing member of Defendant 3Red Group of Illinois, LLC ("3Red"), a propriety trading firm. Besides Johnson, the only other member of 3Red was Defendant Igor B. Oystacher, who was also 3Red's principal trader. In 2011, government regulators began scrutinizing Oystacher's trading practices at 3Red. While Johnson initially believed Oystacher was acting within the law, he later came to harbor serious concerns regarding the legality of Oystacher's trading practices. When Johnson raised the issue with Oystacher, however, Oystacher formed a plan to force Johnson out of 3Red. Ultimately, Oystacher strong-armed Johnson into entering an agreement under which he was terminated from 3Red while also forgoing certain protections and benefits to which he would otherwise have been entitled upon termination. In his Second Amended Complaint ("SAC," Dkt. No. 77), Johnson asserts claims against Oystacher, 3Red, and Defendant Stephen Strohmer under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state law. Defendants now ask this Court to dismiss the case, claiming that when Johnson agreed to resign, he also released any and all claims he had against Defendants that arose prior to his termination. (Dkt. No. 84.) For the reasons that follow, Defendants' motion to dismiss is granted.

**BACKGROUND**

For purposes of deciding the motion to dismiss, the Court accepts the well-pleaded facts in the SAC as true and views them in the light most favorable to Johnson. *See, e.g.*, *Anicich v. Home Depot USA, Inc.*, 852 F.3d 643, 648 (7th Cir. 2017). The SAC alleges as follows.

Prior to his termination, Johnson was the managing member and Chief Risk Officer for 3Red, a high-frequency proprietary trading firm. (SAC ¶¶ 5, 8, 10, 29.) Johnson owned 10% of 3Red; Oystacher owned the remaining 90% and was also the firm's principal trader. (*Id.* ¶¶ 6, 11.)

Beginning in November 2011, government regulators and futures exchanges began to scrutinize 3Red's trading practices. (*Id.* ¶ 12.) Specifically, they believed Oystacher was engaged in "spoofing," an illegal trading practice whereby a trader manipulates the market by "placing bids or offers in a futures market with the intent to cancel said bid or offer prior to execution." (*Id.*) Oystacher and other 3Red traders' spoofing allowed 3Red to reap substantial profits while causing significant losses to other market participants who joined the spoof orders. (*Id.* ¶¶ 22, 25.) In December 2012, in his capacity as 3Red's Chief Risk Officer, Johnson testified before the Commodity Futures Trading Commission ("CFTC") that, in his opinion, Oystacher's trading practices did not constitute spoofing. (*Id.* ¶ 13.) His opinion was informed by industry and legal experts who told Johnson that Oystacher's method of trading was legal. (*Id.* ¶ 14.)

But after the CFTC clarified the types of trading activities that constitute spoofing in May 2013, Johnson changed his mind concerning the legality of Oystacher's trading practices. (*Id.* ¶ 15.) Consequently, Johnson confronted Oystacher and demanded that he stop spoofing or else Johnson would use his power as Chief Risk Officer to suspend Oystacher's trading privileges. (*Id.* ¶ 16.) In response to that threat, Oystacher looked not only to remove Johnson as 3Red's Chief Risk Officer but also as its managing member. (*Id.* ¶ 28.) Standing in the way of Oystacher's

2

objective was 3Red's operating agreement, which prevented Johnson's removal as Chief Risk Officer without his written consent. (*Id.* ¶ 29.) Moreover, the agreement provided that if Johnson was removed as managing member—whether for cause or without cause—Johnson would receive a severance payment equivalent to five times his salary and a buyout of his ownership interest equal to five times his highest capital distribution. (*Id.*)

Oystacher and Strohmer[1] consulted 3Red's corporate counsel to devise a strategy to circumvent the provisions in the operating agreement hindering Johnson's ouster. (*Id.* ¶¶ 31–33.) 3Red's counsel advised against involuntarily terminating Johnson. (*Id.* ¶ 36.) Instead, the counsel recommended 3Red accuse Johnson of bad acts that could serve as the basis for his termination, threaten to terminate him because of those bad acts, and then convince Johnson to resign as Chief Risk Officer and managing member voluntarily and renegotiate his severance and buyout payments to a lower amount. (*Id.*) In carrying out those recommendations, Oystacher hired another law firm to investigate Johnson for wrongdoing that could serve as the basis for his termination. (*Id.* ¶¶ 37–38.) An attorney from that firm drafted a letter to Johnson accusing him of fraudulently misrepresenting his capital contributions to 3Red, improperly withdrawing over $120,000 from 3Red, improperly using 3Red funds for unauthorized travel with family, and submitting a fake operating agreement to 3Red's accountants giving Johnson complete control over the company. (*Id.* ¶ 39.) Each of those accusations was false, ginned up for the purpose of supplying a basis for Johnson's termination. (*Id.* ¶¶ 40–41.)

During a meeting with Oystacher, Strohmer, and 3Red's counsel, Johnson was informed of the accusations against him, threatened with criminal prosecution for fraud, and told that his

---

[1] Strohmer is described in the SAC as simply a 3Red employee, but his exact role at the firm is not specified. (*Id.* ¶ 7.) Notably, Strohmer was first named as a Defendant in the SAC. Yet it does not appear that he was ever served and he has not appeared in this action.

employment with 3Red was being terminated. (*Id.* ¶¶ 7, 46.) Johnson demanded that he receive his severance and buyout payments as set out in 3Red's operating agreement. (*Id.* ¶ 48.) Over the ensuing days, the parties engaged in settlement negotiations. (*Id.* ¶¶ 65–66.) Facing threats of criminal prosecution and locked out of a distribution of 3Red profits to which he was entitled, Johnson ultimately executed a settlement agreement with Defendants on August 15, 2013 ("Settlement Agreement"). (*Id.* ¶¶ 55, 74.)

By entering into the Settlement Agreement, Johnson relinquished his positions as Chief Risk Officer and managing member of 3Red along with his ownership interest in the company in exchange for $450,000—far less than the buyout and severance payments to which he was entitled under 3Red's operating agreement—paid in installments of $10,416.66 per month. (SAC ¶¶ 107–08; Defs.' Mot. to Dismiss, Ex. 1 § 1, Dkt. No. 83-1.)[2] The Settlement Agreement further provides that, if any regulatory body or governmental agency imposes a fine or penalty greater than $1,000,000 on 3Red or suspends its trading activities for longer than five months, 3Red will cease any further payments toward the $450,000. (SAC ¶ 73; Defs.' Mot. to Dismiss, Ex. 1 § 1.) In addition, the Settlement Agreement contains a confidentiality provision that requires Johnson to notify Defendants in writing if he receives any subpoena, written demand, request for documents, or interview or deposition from any regulatory body regarding 3Red. (Defs.' Mot. to Dismiss, Ex. 1 § 11(f).) Johnson also must provide notification if he seeks to meet with, interview, or provide documents to any regulatory body or governmental agency. (*Id.*) And he agrees not to object to the presence of Defendants' counsel at any interview or deposition he gives to a

---

[2] The Settlement Agreement was included as an exhibit to Defendants' motion to dismiss even though it was not attached to the SAC. Because the Settlement Agreement is integral to the allegations in the SAC, the Court may consider the full agreement without converting the motion to dismiss to a motion for summary judgment. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim.").

4

regulatory body. (*Id.*) Finally, the Settlement Agreement contains a provision under which Johnson agrees to release "Oystacher and 3 Red Group . . . [3Red's] subsidiaries, parent and affiliated corporations, and [their] agents [and] employees . . . from any and all legal, equitable or other claims . . . existing from the beginning of the world to the date of this Settlement Agreement." (*Id.* § 3.)

On December 10, 2014, 3Red and Oystacher filed a lawsuit against Johnson in Illinois state court alleging, among other things, that Johnson breached certain provisions in the Settlement Agreement prohibiting him from disclosing the existence of the Settlement Agreement and other confidential information regarding 3Red and Oystacher.[3] (Defs.' Mot. to Dismiss, Ex. 2, Dkt. No. 84-4.) Several months later, Johnson filed the present lawsuit against Defendants 3Red, Oystacher, and Strohmer. In his First Amended Complaint, Johnson brought claims against Defendants under RICO § 1962(b), and the anti-retaliation provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, as well as a number of state law claims. (Dkt. No. 22.) Defendants then moved to dismiss the First Amended Complaint, a request which this Court granted. (Dkt. Nos. 70, 71.) Johnson was given leave to amend his complaint. Shortly thereafter, Johnson filed his SAC. (Dkt. No. 77.) The SAC sets forth four claims. First, Johnson again asserts a RICO claim, this time under § 1962(c), along with a RICO conspiracy claim under § 1962(d). Johnson also brings state law claims seeking declarations that the Settlement Agreement is illegal and void and that the 3Red's operating agreement was valid and enforceable at the time of Johnson's termination.

---

[3] Facts concerning Defendants' state court litigation were not pleaded in the SAC. Nonetheless, they appear in court records attached to Defendants' motion to dismiss of which this Court takes judicial notice. *Langone v. Miller*, 631 F. Supp. 2d 1067, 1070 (N.D. Ill. 2009) ("The Court is also allowed to take judicial notice of matters in the public record, such as filings in other courts.")

**DISCUSSION**

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

While both Defendants and Johnson argue the merits of Johnson's claims at length in their briefs, this Court must first address the threshold issue of whether Johnson released his claims when he entered into the Settlement Agreement. Defendants contend that, other than the claim for a declaration that the Settlement Agreement is void and unenforceable, the claims in the SAC were released under that agreement. As to the enforceability of the Settlement Agreement, Defendants contend that Johnson is precluded (or, put another way, collaterally estopped) from relitigating the issue here because the state trial court has already ruled that the agreement is valid and enforceable. For his part, Johnson does not appear to dispute that the Settlement Agreement contains a broad release that covers his claims. Nonetheless, he argues that the state trial court's ruling on the enforceability of the Settlement Agreement was not a final judgment on the merits with preclusive effect. And even if it was a final judgment, Johnson argues, changes in the law since the trial court's ruling require this Court to revisit the issue.

Both collateral estoppel and release are affirmative defenses. *See, e.g.*, *ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 746 (7th Cir. 2017); *Best v. City of*

*Portland*, 554 F.3d 698, 700 (7th Cir. 2009). Generally, affirmative defenses are not proper bases for granting a Rule 12(b)(6) motion. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Instead, "the proper procedure is to raise the defense and then move for judgment on the pleadings under [Federal Rule of Civil Procedure] 12(c)." *Walczak v. Chi. Bd. of Educ.*, 739 F.3d 1013, 1016 n.2 (7th Cir. 2014). However, a court may dismiss a complaint under Rule 12(b)(6) based on an affirmative defense when it has before it all it needs to rule on the defense and, as here, the plaintiff does not complain about the error. *Id.* This occurs when "an affirmative defense is disclosed in the complaint." *New West v. City of Joliet*, No. 05 CV 1743, 2017 WL 6540046, at *2 (N.D. Ill. Aug. 14, 2017). A complaint discloses an affirmative defense where "(1) the facts that establish the defense are definitively ascertainable from the allegations of the complaint, the documents (if any) incorporated therein, matters of public record, and other matters of which the court may take judicial notice; and (2) those facts conclusively establish the defense." *Id.* Here, the Court finds that it can rule on the affirmative defenses at this stage based on the allegations in the SAC (along with the Settlement Agreement, which is incorporated by reference) and the court filings from Defendants' state court litigation of which the Court takes judicial notice.

The Court first addresses whether collateral estoppel precludes Johnson from arguing in this action that the Settlement Agreement is void and unenforceable. The doctrine of collateral estoppel, or issue preclusion, "prevents the relitigation of issues resolved in earlier causes of action." *State Bldg. Venture v. O'Donnell*, 940 N.E.2d 1122, 1127 (Ill. 2010). In determining whether collateral estoppel applies, this Court looks to Illinois law "[b]ecause the preclusive effect of a state court judgment in a federal case is a matter of state rather than federal law."

*Brokaw v. Weaver*, 305 F.3d 660, 669 (7th Cir. 2002) (internal quotation marks omitted). For collateral estoppel to apply under Illinois law, the following three requirements must be met:

> (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.

*O'Donnell*, 940 N.E.2d at 1127 (internal quotation marks omitted).

The state court litigation was brought by Oystacher and 3Red against Johnson. In that case, Oystacher and 3Red alleged that Johnson breached the Settlement Agreement when he disclosed information in violation of the agreement's confidentiality provisions. Given that Johnson was the defendant in that action, there is no question that the third collateral estoppel requirement has been met. And the issue of the validity of the Settlement Agreement was litigated when Johnson moved to dismiss the complaint. That motion was predicated solely on Johnson's contention that the Settlement Agreement was drafted for an illegal purpose and was therefore void as a matter of public policy. (Defs.' Mot. to Dismiss, Ex. 3, Dkt. No. 84-5.) Johnson argues the identical issue here in his claim seeking a declaration that the Settlement Agreement was void because it was executed to accomplish an illegal purpose. (SAC ¶¶ 156–60.) Thus, the first collateral estoppel requirement has been satisfied as well.

Before determining whether there was a final judgment on the merits satisfying the second requirement, the Court briefly summarizes the procedural history of the state court litigation. As discussed above, Johnson's motion to dismiss was predicated entirely on the validity of the Settlement Agreement. The trial court denied Johnson's motion to dismiss. (Defs.' Mot. to Dismiss, Ex. 6, Dkt. No. 84-8.) Later, the trial court affirmed that its ruling held that the Settlement Agreement was "valid and enforceable." (Defs.' Mot. to Dismiss, Ex. 10 at 5, 7, Dkt. No. 84-12.) During the discovery process, Johnson was sanctioned multiple times. One of the

sanctions imposed by the trial court barred Johnson "from introducing any and all evidence denying his disclosure of confidential information." (*Id.* at 4.) This sanction meant Johnson was unable to contest effectively Oystacher and 3Red's motion for summary judgment, in which they argued that Johnson breached the Settlement Agreement's confidentiality provisions. Consequently, the trial court found that there was no genuine dispute of material fact that Johnson had breached the Settlement Agreement and entered summary judgment in Oystacher and 3Red's favor on all counts. (*Id.* at 9.)

Johnson then filed a notice of appeal. (Defs.' Mot. to Dismiss, Ex. 12, Dkt. No. 84-14.) In his appellate brief, Johnson stated that the issues on appeal were whether the trial court "abuse[d] its discretion in the sanctions orders" and whether it "err[ed] in its reliance on the sanction orders to deny discovery to [Johnson] and to order summary judgment on the basis of a prior sanction order which barred [Johnson] from denying that he breached" the Settlement Agreement. (Defs.' Mot. to Dismiss, Ex. 13 at 2, Dkt. No. 83-8.) Notably, Johnson did not state that he was appealing the order denying his motion to dismiss or the trial court's judgment that the Settlement Agreement was valid and enforceable. Instead, while the appeal was pending, Johnson filed a motion to vacate the trial court's judgment denying his motion to dismiss. (Defs.' Mot. to Dismiss, Ex. 16, Dkt. No. 84-18.) In that motion, Johnson argued that the judgment must be vacated because a recent Illinois Appellate Court decision and amendments to CFTC regulations, 17 C.F.R. § 165.19, 165.20, make clear that the Settlement Agreement was illegal. (*Id.*) However, the trial court denied the motion because it could not entertain arguments based on changes in the law since the judgment was entered. (Defs.' Mot. to Dismiss, Ex. 20 at 3, Dkt. No. 84-22.) Later, when the Illinois Appellate Court addressed Johnson's direct appeal, it affirmed the trial court's

sanctions orders and its grant of summary judgment to Oystacher and 3Red. (Defs.' Reply, Ex. A, Dkt. No. 92-1.)

As demonstrated by the record in the state court litigation, Johnson argued in his motion to dismiss that the Settlement Agreement was void and unenforceable and fully litigated the issue to a judgment on the merits. *See Du Page Forklift Serv., Inc. v. Material Handling Servs., Inc.*, 744 N.E.2d 845, 852 (Ill. 2001) ("When an issue is properly raised, by pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated . . . ." (quoting Restatement (Second) of Judgments § 27 (1982)). The issue then is whether that judgment was final.

Finality, for collateral estoppel purposes, "requires that the potential for appellate review must have been exhausted." *O'Donnell*, 940 N.E.2d at 1127. Following the entry of summary judgment in favor of Oystacher and 3Red, Johnson had an opportunity to appeal the denial of his motion to dismiss. As the trial court recognized when it denied Johnson's motion to vacate its judgment on the motion to dismiss, "[t]he matter was a final and appealable order." (Defs.' Mot. to Dismiss, Ex. 20 at 3.) Yet Johnson only appealed the sanctions orders, the imposition of which led to the grant of summary judgment for Oystacher and 3Red. Due to Johnson's failure to appeal the denial of his motion to dismiss, the trial court's judgment that the Settlement Agreement was valid and enforceable became final. *See Kenny v. Interim Gen. Superintendent of Sch.*, 445 N.E.2d 356, 361 (Ill. App. Ct. 1983) ("A trial court's judgment not appealed becomes final and is *res judicata* to an identical claim."); *Lake Cty. Forest Preserve Dist. v. Vernon Hills Dev. Corp.*, 421 N.E.2d 1018, 1020 (Ill. App. Ct. 1981) ("It is generally the rule that no question which was raised or could have been raised in a prior appeal on the merits can be urged on subsequent appeal, and that those issues not raised can be considered waived."); *see also Application of Cook Cty.*

*Collector*, 593 N.E.2d 538, 550 (Ill. App. Ct. 1991) ("[A]n order from which an appeal might have been taken may not be reviewed on appeal from a subsequent order entered in the same case.").

Although Johnson concedes that his appeal was premised on the trial court's sanctions and summary judgment orders, he claims that the summary judgment order was itself premised, in part, on the trial court's denial of his motion to dismiss. Johnson thus contends that if his appeal is successful, the validity of the Settlement Agreement will once again be before the trial court. To the extent that was true when Johnson submitted his brief, the Illinois Appellate Court has since denied his appeal and that likely ensures finality.[4] Ultimately, it is of no consequence because this Court finds that Johnson is wrong in asserting that a successful appeal would allow him to relitigate the validity of the Settlement Agreement.

At issue with Oystacher and 3Red's motion for summary judgment was whether Johnson breached the Settlement Agreement, specifically its confidentiality provisions. Because the trial court issued a sanction barring Johnson from introducing evidence denying his disclosure of confidential information, summary judgment in Oystacher and 3Red's favor was essentially assured. If Johnson's appeal of the sanctions had been successful, he could have gone back to the trial court and attempted to introduce evidence creating a dispute of material fact as to whether he disclosed confidential information. But overturning those sanctions would have done nothing to affect the trial court's earlier judgment concerning the validity of the Settlement Agreement. Indeed, in its summary judgment ruling, the trial court affirmed that "[t]here is no dispute that a contract existed" because the trial court previously held "that the agreement was valid and

---

[4] This Court cannot conclude that Johnson exhausted the appeals process given the possibility of appeal to the Illinois Supreme Court. No party has submitted any court filing demonstrating that such an appeal has or has not been taken.

enforceable." (Defs.' Mot. to Dismiss, Ex. 10 at 5.) That judgment became final when Johnson failed to appeal it.

Now, Johnson argues before this Court that the issue should be revisited given changes in the law since the state trial court denied his motion to dismiss. It is true that in Illinois, a "change in law renders the doctrines of *res judicata* or collateral estoppel inapplicable." *Gallaher v. Hasbrouk*, 3 N.E.3d 913, 925 (Ill. App. Ct. 2013). Johnson points to a recent Illinois Appellate Court case as well as amendments to CFTC regulations as the relevant new law. And while Johnson introduced both authorities to the trial court in his motion to vacate judgment, this Court finds that the trial court never reached the merits of the issue. Thus, the Court must determine whether there has in fact been a change in law requiring collateral estoppel to give way.

Johnson cites *Signapori v. Jagaria*, 84 N.E.3d 369 (Ill. App. Ct. 2017), as new law requiring reconsideration of the trial court's ruling that the Settlement Agreement was valid and enforceable. In *Signapori*, two parties entered into an agreement that, if disclosed, would have revealed that they had made false statements in loan applications related to their shared businesses. Therefore, they included a confidentiality provision in the agreement stating that the existence of the agreement was confidential and could not be disclosed for any reason to any person or entity "including any bank [or] financial institution" without the written consent of the other party. *Id.* at 372. The question before the Illinois Appellate Court was whether that provision was void as a matter of public policy. The Illinois Appellate Court held that contracts barring the reporting of crimes were against Illinois public policy and thus void. *Id.* at 375. And because the confidentiality provision was entered into for the purpose of concealing possible crimes, it was held to be void and unenforceable. *Id.* at 378.

But *Signapori* hardly represents new law. Indeed, the Illinois Appellate Court emphasized in its decision that Illinois public policy could be found in "the constitution, statutes, and **long-standing case law**." *Id.* at 374 (emphasis added). And in holding that contracts barring the reporting of crimes were void, it cited numerous cases, many decades old. *E.g.*, *id.* at 375 (citing *Williams v. Jernberg*, 240 N.E.2d 758 (Ill. App. Ct. 1968) and *Griner v. Griner*, 340 N.E.2d 304 (Ill. App. Ct. 1976)). Moreover, the confidentiality provision in *Signapori* is not analogous to any provision in the Settlement Agreement here. Johnson tries to equate it with the provision requiring him to give notice to Defendants of certain communications with regulatory bodies or governmental agencies and not to object to the presence of Defendants' counsel at any potential interview or deposition with a regulator.[5] However, that provision does not allow Defendants to stop Johnson from reporting any crimes to an appropriate governmental or regulatory body. It simply requires notice before doing so. By contrast, in *Signapori*, the non-disclosing party had complete control over whether the disclosing party could report criminal wrongdoing. If the non-disclosing party withheld written consent (as he almost certainly would), then the disclosing party would be in breach if he reported the misconduct. In short, *Signapori* does not constitute a change in law sufficient to deprive the trial court's denial of the motion to dismiss of preclusive effect.

Johnson also points to recent amendments to the CFTC's whistleblower regulations as constituting a change in law that warrants reevaluating whether the Settlement Agreement is valid and enforceable. First, 17 C.F.R. § 165.19 was modified to make clear that no individual could take "any action to ***impede***" another from communicating with the CFTC regarding violations of the Commodity Exchange Act, "including by enforcing, or threatening to enforce, a

---

[5] Notably, the Settlement Agreement provides that any regulatory body may object to the presence of Defendants' counsel at an interview and the regulator's decision controls. (Defs.' Mot. to Dismiss, Ex. 1 § 11(f).)

confidentiality agreement . . . with respect to such communications." 17 C.F.R. § 165.19(b) (emphasis added). Further, a new regulation was adopted, which, among other things, made clear that the CFTC's "anti-retaliation protections apply whether or not the whistleblower satisfies the requirements, procedures, and conditions to qualify for an award. *Id.* § 165.20(c). The purpose of that amendment was to encourage whistleblowers to report internally by making anti-retaliation protections available to those who did so. *See* 82 Fed. Reg. 24,487, 24,493–94 (May 30, 2017).

Johnson claims that Defendants' actions run afoul of the amended regulations because those actions impeded his ability to contact the CFTC directly by imposing various terms and conditions on Johnson's prospective communications with regulators. Yet Johnson brought those regulations to the attention of the trial court while briefing the motion for summary judgment. At the time, the regulations were proposed and not final, although the proposed language mirrored exactly the final regulations. *See* 81 Fed. Reg. 59,551, 59,561–62 (Aug. 30, 2016). In its ruling on the motion, the trial court stated that the proposed regulations had "no application" because the Settlement Agreement "does not preclude [Johnson] from exercising his rights under any whistleblower statute, it simply requires notice if he is in receipt of any subpoena or written demand for documents or questioning of any regulatory or governmental agency."[6] (Defs.' Mot. to Dismiss, Ex. 10 at 7.) But ultimately, that portion of its opinion was dicta as the trial court explicitly stated that it was not adjudicating the issue on the merits as it should have been raised as an affirmative defense. (*Id.*)

---

[6] The fact that the trial court addressed the applicability of the CFTC regulations in ruling on the motion for summary judgment does not mean that the validity of the Settlement Agreement was before it at that stage. Indeed, while the trial court briefly entertained arguments related to the regulations, it ultimately concluded that "it has already been declared that the [Settlement Agreement] is valid and enforceable and [Johnson] is precluded from now arguing the legality of the agreement." (Defs.' Mot. to Dismiss, Ex. 10 at 7.)

In the end, this Court need not take a position on the applicability of the new CFTC regulations because even if they applied, at most they would void only those particular provisions in the Settlement Agreement that operated to impede Johnson from contacting the CFTC. That is because the Settlement Agreement contains a severability provision stating that "if for any reason any provision of this Settlement Agreement is determined to be invalid or unenforceable, the remaining provisions of this Settlement Agreement nevertheless shall be construed, performed, and enforced as if the invalidated or unenforceable provision had not been included in the text of the Agreement." (Defs.' Mot. to Dismiss, Ex. 1 §18.) Under Illinois law, a severability clause "strengthens the case for the severance of unenforceable provisions because it indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions." *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993). But in certain circumstances, where a provision is deemed "essential," its invalidation will invalidate the entire contract. *See id.* at 1343–44. And while Johnson argues that the entire purpose of the Settlement Agreement was to impede him from communicating with regulators, the severability provision explicitly identifies only one essential provision by stating that it does not apply in the event that section 1 of the agreement is invalidated. That section concerned Johnson's agreement to leave 3Red and give up his ownership interest in exchange for the $450,000 payment. Consequently, even if the notice and non-objection provisions in the Settlement Agreement ran afoul of the new CFTC regulations, it would not be grounds for invalidating the entire contract.[7]

---

[7] The Court is also skeptical that it could retroactively void a contract on public policy grounds based on a change in the law after the execution of the agreement. Generally, Illinois law "forbids retroactive application of substantive changes to statutes." *Caveney v. Bower*, 797 N.E.2d 596, 602 (Ill. 2003). And "[t]he largest category of cases in which [courts] have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which

Because Johnson is collaterally estopped from relitigating the validity and enforceability of the Settlement Agreement in the instant action, this Court dismisses his claim seeking a declaration that the Settlement Agreement is void. From there, the Court must dispose of the remainder of the claims under the Settlement Agreement's release provision. Under Illinois law, "[w]hen a release is unambiguous, a court must construe it as written without looking to parol evidence." *ADM All. Nutrition*, 877 F.3d 742, 746–47 (7th Cir. 2017). Here, the release provision is unambiguous and broad. Johnson does not contend otherwise. That provision released any and all claims Johnson had against 3Red and its employees and agents that existed prior to the execution of the Settlement Agreement. Each of the remaining claims in this lawsuit arose prior to the execution of the Settlement Agreement. The RICO claims concern Defendants' conduct culminating in Johnson's ouster from 3Red and his relinquishment of the full amount of the benefits to which he was entitled in the event of his termination. Similarly, the other state law declaratory judgment claim seeks a declaration that 3Red's operating agreement was valid and enforceable at the time of Johnson's termination on June 17, 2013, which preceded the execution of the Settlement Agreement on August 15, 2013. (SAC ¶¶ 74, 162–63.) Because the Settlement Agreement is valid and enforceable, Johnson released all the claims remaining in this action.

---

predictability and stability are of prime importance." *Foster Wheeler Energy Corp. v. LSP Equip., LLC*, 805 N.E.2d 688, 694 (Ill. App. Ct. 2004).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Complaint (Dkt. No. 84) is granted. The SAC is dismissed with prejudice and Judgment will be entered in favor of Defendants.

Dated: September 30, 2019

ENTERED:

_____
Andrea R. Wood
United States District Judge